The JACK STONE COMPANY, Inc.

v.

The UNITED STATES.

No. 312–62.

United States Court of Claims.
April 16, 1965.

Michael A. Schuchat, Washington, D. C., for plaintiff.

Joan T. Berry, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge.[1]

This is a contract case which is before the court on cross-motions for summary judgment. The plaintiff complains that in its performance under a contract for electrical work at the National Institutes of Health, Bethesda, Maryland—entered into between the plaintiff and the General Services Administration—it was required to install certain brand-name items it alleges were more costly than similar items manufactured by another firm which were equal to the other and permitted under the terms of the contract. It is said that the contracting officer's refusal, sustained by the Board of Review of the General Services Administration, to allow the use of the alternate items was contrary to the agreement, capricious, arbitrary, and not supported by substantial evidence. We have before us the entire record on which the action of the Board of Review was taken, including the briefs of the parties.

Two main questions are presented. First, did the contract require the installation of the brand-name items, or stated conversely, did it permit the use of alternate "equal" items? Second, is the adverse action by the Board of Review final and conclusive against the plaintiff under the terms of the Wunderlich Act?

In August 1960, the Public Buildings Service of the General Services Administration issued an invitation to bid on a project covering the modernization of the electric power and alarm system at the National Institutes of Health. The plaintiff was the successful bidder under this invitation.

1. Trial Commissioner William E. Day, whose opinion has been very helpful, reached another conclusion.

The printed general conditions which were included in the contract specifications contained a provision entitled "Standard References" which reads, in part, as follows:

"1–19.  STANDARD REFERENCES

\*  \*  \*  \*  \*

"(c) Reference in the specifications to any article, device, product, materials, fixture, form or type of construction by name, make, or catalog number, shall be interpreted as establishing a standard of quality, and not as limiting competition. The Contractor may make substitutions equal to the items specified if approved in advance in writing by the Contracting Officer. \*  \*  \*"

Section 16 of the specifications related to the fire alarm system. Paragraph 16–3 provided as follows:

"16–3.  GENERAL.—The Contractor shall furnish all labor and materials necessary to install complete all additions and revisions to the existing Fire Alarm System as herein specified and as shown on Drawings Nos. 27–207 through 27–218. The existing system is of Sperti Faraday manufacture. All new equipment and parts furnished shall be of the same manufacturer to insure full and satisfactory performance of the completed system."

There was a reference to Sperti Faraday items in sixteen of the paragraphs of section 16 on the fire alarm system.

In August 1960, when it saw the invitation, the plaintiff apparently requested from the Sperti Faraday firm a quotation on the materials necessary for the fire alarm and watch report systems. It received such a quotation by the end of August, but it did not base its bid on that amount but on a lower sum for which it estimated that it could obtain the equipment. The contract was dated October 13, 1960, and the notice to proceed came on October 21, 1960. There was a year to do the work.

On January 31, 1961, the defendant wrote to the plaintiff requesting that it submit, as required by the specifications, a list of material which the plaintiff intended to use in its performance of the work. The plaintiff submitted some information, apparently in response to this letter, which included the contractor's shop drawings showing the use of equipment for the fire alarm and watch report systems which was manufactured by American District Telegraph Company (A.D.T.). On February 21, 1961, the plaintiff was advised that the material lists and catalogue materials showing the A.D.T. items for the fire alarm and watch report systems were not approved because the material " \* \* \* does not comply with the specifications." On March 9, 1961, the plaintiff wrote to the contracting officer requesting, in effect, reconsideration of the A.D.T. material and approval of its use. The letter complained that the plaintiff considered the price quoted by Sperti Faraday to be very much out of line. The contracting officer replied, on March 21, 1961, in the following terms:

"This is in reply to your letter of March 9, 1961, relative to your request to substitute the use of A.D.T. Co. components in the renovation of the existing Sperti-Faraday fire alarm and watchman report systems and in the installation of related extensions and additions in the various buildings at the National Institutes of Health, Bethesda, Md.

"We have investigated this matter and have determined that the renovation and the related extensions and additions using different manufacturer's components in conjunction with the existing fire alarm and watchman report systems, will not satisfy the requirements of the Government.

"You are, therefore, instructed to proceed with the use of Sperti-Faraday equipment and services as indicated and as specified under the contract requirements."

The plaintiff countered with a proposition that it use Sperti Faraday material on some of the work (the individual fire alarm systems) but that it would use A.D.T. equipment on the balance (the central system). On April 12, 1961, the contracting officer wrote to the plaintiff directing that it proceed with the work using Sperti Faraday equipment as it had been instructed by the defendant's March 21 letter. The plaintiff was told that this was the final decision of the contracting officer and that it had the right of appeal under the disputes clause of the contract.

On April 17, 1961, the plaintiff, by counsel, appealed the contracting officer's decision of April 12, 1961, to the Administrator of the General Services Administration. The appeal was heard for the Administrator by the G.S.A. Board of Review (on June 20, 1961) and was denied on August 16, 1962. While the appeal was pending, plaintiff used Sperti Faraday products to complete performance.

The basis for the Board's rejection of the appeal was that the specifications expressly called for the Sperti Faraday material, that in the planning stage it had been decided that the fire alarm system should be of one manufacturer—a system manufactured by one company as distinguished from a mixed system comprised of equipment produced by more than one manufacturer. Various factors were pointed out by the decision as believed to be of importance in restricting the specifications to the one manufacturer, including reliability, protection and maintenance. While the Board did not affirmatively find that the A.D.T. equipment was equal to the Sperti Faraday equipment, it found that the record did not indicate that the Government considered it unequal or inadequate. The provisions of paragraph 1–19 of the general conditions of the specifications, supra, were held to be permissive. Since the contracting officer felt that the work in question required the use of Sperti Faraday products, the refusal of the contracting officer to approve the substitute could not, said the Board, be arbitrary and capricious.

In this court, plaintiff limits its claim to the equipment for the new central fire alarm system at the National Institutes (which was about 91% of the total work), abandoning any demand for the 9% of the work concerned with changes made in the existing fire alarm installations (of Sperti Faraday manufacture) in the various buildings. Plaintiff's position is that the central system, although connected with the individual units, was sufficiently separate and detached that there could be no reasonable objection to the use of A.D.T. equipment for that phase of the contract.

On the threshold question of whether the administrative decision is final and conclusive against the plaintiff and binding upon this court, it is clear that the main question resolved by the G.S.A. Board of Review is one of interpretation of the language of the contract specifications. As such, it is a ruling on a legal question and not final against the plaintiff or binding on the court. See 41 U.S.C. § 322; Jansen v. United States, Ct.Cl., 344 F.2d 363, decided this day, and cases cited. The Board held that paragraph 1–19, the "standard references" clause, supra, merely authorized the contracting officer, if he wished, to agree to a substitution, but that the contract as a whole called for Sperti Faraday material and nothing else.

In construing the contract, the Board, we think, slighted paragraph 1–19, which provided, first, that any reference to article or product "by name, make, or catalog number, shall be interpreted as establishing a standard of quality, and not as limiting competition", and, second, that the contractor "may make substitutions equal to the items specified if approved in advance in writing by the Contracting Officer." This general clause was an integral part of a standard form contract promulgated by the Public Buildings Service of the General Services Administration. It was designed to discourage

the potentially monopolistic practice of demanding the use of brand-name or designated articles in government contract work. The framers of the clause obviously thought that it was in the national interest to widen the area of competition, and to bar local procurement officials from choosing a particular source either out of favoritism or because of an honest preference. This anti-restrictive purpose has a long history behind it.[2] To advance this long-accepted end of freer competition, the paragraph expressly declared, in the broadest terms, that a reference by the specification writer to "*any* article, device, product, materials, fixture, form or type of construction by name, make, or catalog number *shall* be interpreted as establishing a *standard of quality*, and *not* as limiting competition" (emphasis added). The normal understanding of this provision would be that, every time a brand name appeared in the specifications, it should be read as referring, not only to the particular manufacturer or producer which was designated, but also to any equal article or product.

The use of "shall", not "may", shows that the clause does not merely give the contracting officer permission, if he so desires, to allow an item of another manufacture; he is required by paragraph 1–19 to interpret the brand-name citations in the specifications as establishing no more than a "standard of quality." The contracting officer does have to exercise judgment to determine whether the item proposed to be substituted is equal in quality and performance to the designated proprietary product, but his power does not extend to a refusal to allow a replacement which is equal in these respects. The defendant also contends that paragraph 1–19 applies only where the detailed specifications explicitly add the words "or equal" when incorporating a particular brand. But the first sentence of the general clause is much broader in wording and purpose, covering all references to any brand-name article. It would have no function at all if its effect were confined to those instances where the drawer of the specifications declared, himself, that an equal substitution was acceptable.

We see no reason why paragraph 1–19 should not be accorded its ordinary meaning in the present contract. All the references in the detailed specifications to Sperti Faraday equipment can be, and should be, "interpreted as establishing a standard of quality"—as paragraph 1–19 requires. In the light of that paragraph, there is no language (such as the phrase "Sperti Faraday *only*") suggesting anything other than a "standard of quality." Nor does the record show that the contracting officer or the specification writer had any dispensation to delete or modify that standard clause or to change the policy it incorporates. If the National Institutes of Health or the Public Buildings Service desired to assure that only Sperti Faraday material would be installed, they should have taken the necessary steps to omit or change paragraph 1–19.[3] Since the clause was included *in toto* without any expressed qualification, it must be given its normal sphere of operation. Cf. Kaiser Industries Corp. v. United States, Ct.Cl., 340 F.2d 322, p.

2. The Comptroller General has for many years emphasized the restrictive impact on competitive bidding of using brand names without adding "or equal", and the better practice of specifying, if possible, the requirements without any reference to brand names at all. See 5 Comp.Gen. 835, 837 (1926); 5 Comp.Gen. 963, 966 (1926); 16 Comp.Gen. 171, 172–173 (1936); 32 Comp.Gen. 384, 386–387 (1953); 33 Comp.Gen. 524, 527 (1954); 38 Comp.Gen. 291, 293–294 (1958); 38 Comp.Gen. 380, 383–384 (1958); 39 Comp.Gen. 101, 107–108

(1959); 41 Comp.Gen. 76, 80 (1961); 41 Comp.Gen. 242, 250 (1961); 41 Comp. Gen. 348, 350–351 (1961).

3. If it was as unwise as defendant urges to "mix" an A.D.T.-installed central fire alarm system with the existing Sperti Faraday local systems, and therefore necessary to have a Sperti Faraday central system, the Public Buildings Service should have eliminated paragraph 1–19 or plainly provided that it not govern the fire alarm work.

329, decided Jan. 22, 1965; Pfotzer v. United States, 77 F.Supp. 390, 399–400, 111 Ct.Cl. 184, 226 (1948), cert. denied, 335 U.S. 885, 69 S.Ct. 237, 93 L.Ed. 424 (1948); Loftis v. United States, 76 F. Supp. 816, 826, 110 Ct.Cl. 551, 629 (1948).

Moreover, the record does not even show, affirmatively, that this was the kind of contract from which the paragraph should have been excluded. The Government insists that it was improper to have a central fire alarm system of one manufacture connected with local building alarms of another source, but the evidence before the Board on this point was quite conflicting and the Board made no finding of its own on the issue. On the other hand, one of the purposes of the general policy reflected in paragraph 1–19 is to prevent particular manufacturers from being unduly favored in government procurement; and the record does suggest strongly that the Sperti Faraday company was consulted and participated in the drafting of the specifications on the fire alarm system (see Tr. 115–16, 119, 126). That is one reason why we find irrelevant the Board's conclusion that the defendant's procurement officials subjectively intended Sperti Faraday equipment to be the only kind used. That type of unilateral subjective intention on the part of the local contracting officials, which it was the aim of paragraph 1–19 to nullify, cannot prevail over the express and objective declaration that the references to Sperti Faraday materials "shall be interpreted as establishing a standard of quality, and not as limiting competition."

There is no proof in the Board record, and no finding by the Board, that the plaintiff understood that Sperti Faraday was necessarily to be the only source. It is said, however, that the contractor did not raise any question about a possible substitution at the time of bidding, although given warning in the specifications.[4] The answer, in our view, is that there was no patent ambiguity or conflict on the face of the contract, and no unresolvable inconsistency. See WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963); Guyler v. United States, 314 F.2d 506, 510–511, 161 Ct.Cl. 159, 168 (1963) (concurring opinion); Tulelake Irrigation District v. United States, Ct.Cl., 342 F.2d 447, p. 452 (1965); Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 7 (1963). There were, it is true, many citations to Sperti Faraday in the detailed specifications, but all these references were fully consistent with the general statement in paragraph 1–19 that they were no more than standards of quality—"standard references" as the heading to the paragraph puts it— and were to be so interpreted. The contractor was not on notice that Sperti Faraday equipment, and nothing else, would be acceptable. He might foresee difficulty in convincing the contracting officer that some other firm's products were as good as the named brand, but he could properly believe that under the contract he had the right to make the effort.

To this must be added the fact that the warning in this contract to seek the advice of the defendant's officials (see footnote 4, supra) was not as specific and mandatory as that in Beacon Constr. Co. v. United States, supra, 314 F.2d 501, 504, 161 Ct.Cl. at 6. There, the bidder was expressly told that in case of a discrepancy he should submit the problem to the contracting officer "without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense." Here, the thrust of the caution seems to have been to submit any inquiries the bidder might choose to make *in writing*, rather than orally, and *in time*; the bidder was not

4. The cover sheet of the specifications provided, in red bold-faced type: "NOTICE: QUESTIONS REGARDING THESE BIDDING DOCUMENTS, DRAWINGS AND SPECIFICATIONS MUST BE SUBMITTED IN WRITING AND REACH THE ISSUING OFFICE IN SUFFICIENT TIME TO PERMIT ISSUANCE OF ADDENDA NOT LATER THAN 10 CALENDAR DAYS BEFORE BID OPENING DATE."

told plainly, as in Beacon Construction, that he had, at his peril, to submit all of his doubts for resolution by the contracting officials.

■ Our conclusion is that under this contract plaintiff was not required to furnish Sperti Faraday equipment alone, but could supply articles from another source if they were equal to Sperti Faraday and if the consent of the contracting officer was sought in advance. The major cases on which defendant relies differ significantly, among other respects, in that those contracts contained no provision like paragraph 1–19. Farwell Co. v. United States, 148 F.Supp. 947, 137 Ct.Cl. 832 (1957); Henry Spen & Co. v. United States, 153 F.Supp. 407, 139 Ct. Ct. 613 (1957); Octagon Process, Inc. v. United States, 141 Ct.Cl. 599, 604 (1958). These decisions hold that the Government is entitled to get what its contract demands; they do not hold that a clause comparable to paragraph 1–19 is ineffective or means something other than what it says. In addition, it is worth noting that in Henry Spen & Company (the only one of the cases involving a brand name), the court found that prior contracts between the same parties for the same item had used "or equal" while the agreement in suit omitted that qualification, and also that the contractor had failed to prove that his substitute was in fact equal.

The remaining questions are whether the contractor sought advance approval of the use of A.D.T. equipment and whether that firm's articles were the equal of Sperti Faraday. In the spring of 1961 the contractor did ask the contracting officer to approve the substitution. The request was denied, not because the contracting officer felt that the A.D.T. material was inferior, but because he interpreted the contract as giving the defendant the right to insist on Sperti Faraday equipment even though the A.D. T. material was equal in all respects. This appears both from the contracting officer's letters to plaintiff and from the oral testimony before the Board of Review (see, e. g., the testimony of Messrs. Myers and Hespe of the General Services Administration, at Tr. 122–24). Accordingly, the Board correctly found: "The Contracting Officer's decision and the evidence offered in support of it points to the fact that the A.D.T. equipment does not meet the requirements of the specifications because those requirements call for equipment of Sperti Faraday manufacture", and, again, "Here the Contracting Officer found that the requirements for the work in question required the products of Sperti Faraday."

As to the issue of whether the A.D.T. equipment was in fact equal, we think that the Board has so found, on substantial evidence. The finding was: "The record does not indicate that the Government classes the A.D.T. equipment as unequal or that the A.D.T. fire alarm system is inadequate." Though put in negative form, this is the equivalent of a finding of equality and adequacy. There was substantial supporting testimony before the Board (see, e. g., Tr. 48–50, 66, 68, 122–24) and we therefore accept its finding.

The plaintiff is entitled to an amount in the nature of the equitable adjustment which the Board should have granted under the Changes article because plaintiff was required to install Sperti Faraday equipment in the central fire alarm system, rather than A.D.T. equipment.

The defendant's motion for summary judgment is denied. The plaintiff's cross-motion is granted. The plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined under Rule 47 (c).